

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

---

*William D. Moomau*
*Assistant United States Attorney*
*William.Moomau@usdoj.gov*

*Mailing Address:*
*6500 Cherrywood Lane, Suite 200*
*Greenbelt, MD 20770-1249*

*Office Location:*
*6406 Ivy Lane, 8th Floor*
*Greenbelt, MD 20770-1249*

*DIRECT: 301-***
*MAIN: 301-***
*FAX: 301-344-***

November 6, 2020

Alfred Guillaume III, Esq.
6305 Ivy Ln.
Suite 700
Greenbelt, MD 20770

Re:   United States v. Kevin Alexis Rodriguez-Flores,
      Criminal No. PX 20-229

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Kevin Alexis Rodriguez-Flores (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. **This plea agreement is entered into and will be submitted to the Court pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.** If this offer has not been accepted by **November 19, 2020**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offenses of Conviction

1.      The Defendant agrees to plead guilty to the Superseding Indictment charging him in Count One with Conspiracy to Participate in a Racketeering Enterprise ("RICO Conspiracy") in violation of 18 U.S.C. § 1962(d) and in Count Two with Conspiracy to Destroy and Conceal Evidence in violation of 18 U.S.C. § 1512(k). The Defendant admits that the Defendant is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offenses

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are that on or about time alleged in the Superseding Indictment, in the District of Maryland and elsewhere:

        a.      Count One (RICO Conspiracy): (a) an Enterprise, MS-13, existed, consisting of a group of persons associated together for a common purpose of engaging in a course of conduct; (b) the Enterprise engaged in, or its activities in some way affected, interstate or foreign commerce; (c) the Defendant was associated with the Enterprise; (d) the Defendant knowingly and intentionally entered into an agreement that a conspirator would conduct, or participate in the

conduct of, the affairs of the Enterprise through a pattern of racketeering activity; and (e) the Defendant agreed a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

   b. Count Two (Conspiracy to Destroy and Conceal Evidence): (1) two or more persons entered into the unlawful agreement charged in the Superseding Indictment; and (2) the Defendant knowingly and willfully became a member of the conspiracy.

Penalties

   3. The maximum penalty provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 1 | 18 U.S.C. § 1962(d) | N/A | Life | 5 years | $250,000 | $100 |
| 2 | 18 U.S.C. § 1512(k) | N/A | 20 Years | 3 Years | $250,000 | $100 |

   a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

   b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

   c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

   d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

   e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

   f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant

agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant

may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

   g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

   h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

   5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

   6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

   <u>Count One</u>

   a. Pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2E1.1(a)(2), the base offense level is the offense level applicable to the underlying racketeering activity. The Defendant is pleading guilty to RICO Conspiracy that includes first-degree murder. Under U.S.S.G. § 2A1.1(a), the base offense level for first-degree murder is **43**.

   b. A **2**-level enhancement applies, pursuant to U.S.C.G. § 3C1.1, because the

Defendant attempted to obstruct the investigation of the offense charged in Count One, which included the murder of Victim-1 as described in Attachment A.

### Count Two

c.      This Office and the Defendant agree that the applicable base offense level for Count Two is **30**, pursuant to U.S.S.G. §§ 2J1.2, 2X3.1(a)(3)(A), 2E1.3, and 2A1.1, because the Defendant endeavored to obstruct the prosecution of crimes involving the murder of Victim-1.

### Grouping

d.      Counts One and Two group, pursuant to U.S.S.G. §§3D1.2(c) and 3C1.1, Application Note 8.  In accordance with U.S.S.G.§ 3D1.3(a), the offense level for the group is the highest offense level for the counts in the group.  The highest offense level for Counts One and Two is **45**.

e.      This Office does not oppose a **2**-level reduction in the Defendant's offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty.  This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.      There is no agreement as to the Defendant's criminal history.  The Defendant further understands that the Defendant's criminal history could alter the Defendant's offense level.  Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.      Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

### Rule 11(c)(1)(C) Plea

9.      The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence within the range of **360 months of imprisonment to life**

Rev. August 2018

**imprisonment** is the appropriate disposition of this case taking into consideration the nature and circumstances of the offense, the Defendant's criminal history, and all of the other factors set forth in 18 U.S.C. § 3553(a). This Agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this Agreement, except under the circumstances noted below, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor the Government will be bound by the specific sentence contained in this Agreement, and the Defendant will not be able to withdraw his plea.

## Obligations of the Parties

10.     At the time of sentencing, this Office and the Defendant will jointly request that the Court impose a sentence within the range of **360 months of imprisonment to life imprisonment**. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable period of supervised release and/or fine. This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

11.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statutes to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statutes, to the extent that such challenges legally can be waived.

b.      If the Court imposes a term of imprisonment within the agreed-upon range, the Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

Rev. August 2018

6

   c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

<u>Defendant's Conduct Prior to Sentencing and Breach</u>

   12. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

   13. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

<u>Entire Agreement</u>

   14. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

Rev. August 2018

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

William D. Moomau
Erin B. Pulice
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

1-11-21
Date

Kevin Alexis Rodriguez-Flores

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

1-11-21
Date

Alfred Guillaume III, Esq.

Rev. August 2018

8

**ATTACHMENT A**

**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

**The MS-13 Gang**

La Mara Salvatrucha, a/k/a the MS-13 gang ("MS-13"), is a gang composed primarily of immigrants or descendants of immigrants from El Salvador, and other Central American countries, with members operating in the State of Maryland, the State of Virginia, and throughout the United States. In the United States, MS-13 has been functioning since at least the 1980s. MS-13 actively recruited members, including juveniles, from communities with a large number of immigrants from El Salvador and other Central American countries.

At all relevant times, members of MS-13 from time to time signified their membership by wearing tattoos reading "MARA SALVATRUCHA," "MS," "MS-13," or similar tattoos, often written in gothic lettering. Members also signified their membership through tattoos of devil horns in various places on their bodies. Members sometime avoid conspicuous MS-13 tattoos with discreet ones such as "503," spider webs, three dots in a triangle formation signifying "vida loca," or clown faces with phrases such as "laugh now, cry later." Some MS-13 members have chosen not to have tattoos at all, or to have them placed on areas such as the hairline where they can be easily covered, in order to conceal their gang affiliation from law enforcement.

The gang colors of MS-13 were blue, black, and white, and members often wore clothing, particularly sports jerseys, with the number "13" or with numbers that, when added together, totaled 13, such as "76." MS-13 members also wore blue and white clothing to represent their membership, including blue and white shoes such as Nike "Cortez." As with tattoos, some MS-13 members have selected more discreet ways of dressing in order to signify their membership and at the same time avoid detection by law enforcement. MS-13 members referred to one another by their gang names, or monikers, and often did not know fellow gang members except by their gang names.

At all relevant times, members of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members required that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members were expected to use any means necessary to force respect from those who showed disrespect, including acts of intimidation and violence.

At all relevant times, members and associates of MS-13 frequently engaged in criminal activity, including, but not limited to, acts involving murder, assault, extortion, distribution of controlled substances, and intimidating and retaliating against witnesses and members suspected of cooperating with law enforcement, as well as attempts and conspiracies to commit such

offenses. MS-13 members were required to commit acts of violence both to maintain membership and discipline within the gang and against rival gangs. Participation in criminal activity by a member, particularly violent acts directed at rival gangs or as directed by the gang leadership, increased the respect accorded to that member, resulted in that member maintaining or increasing his position in the gang, and opened the door to a promotion to a leadership position. One of the principal rules of MS-13 was that its members must attack and kill rivals whenever possible. Rivals are often referred to as "chavalas." The chief rival of MS-13 in the Washington D.C. metropolitan area and world-wide was the 18th Street gang.

At all relevant times, prospective members who sought to join MS-13 were required to prove that they were worthy of advancement by "putting in work" as directed by senior members. "Work" can include acting as a lookout during crimes, selling controlled substances, attacking chavalas and other persons deemed as threats, and other activities that advance gang objectives. As far as membership ranks, individuals who did favors and other acts for the gang were called "paros." Persons being observed by the gang for potential advancement above the rank of paro were known as "observations." Individuals who had advanced to the final level before being "jumped in" were called "chequeos," or "cheqs."[1] Chequeos underwent a probationary period during which they were required to commit crimes on behalf of MS-13 to achieve trust and prove their loyalty to the gang. To advance to the final rank of "homeboy," members were required to complete an initiation process, often referred to as being "jumped in" or "beat in" to the gang. During that initiation, other members of MS-13 would beat the new member, usually until a gang member finished counting aloud to the number thirteen, representing the "13" in MS-13.

MS-13 is an international criminal organization, and is organized in Maryland and elsewhere into "cliques," that is, smaller groups operating in a specific city or region. Cliques operated under the umbrella rules of MS-13. MS-13 cliques often work together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. In Maryland and the surrounding area, these cliques included Los Ghettos Criminales Salvatrucha clique (LGCS/"Ghettos"), Sailors Locotes Salvatrucha Westside ("SLSW"), Parkview Locótes Salvatrucha ("PVLS"), Pinos Locotes Salvatruchas ("PLS"), Fultons Locotes Salvatruchas ("FLS"), and Normandie Locotes Salvatruchas ("NLS"), among others. Each clique was presided over by the "First Word," the leader or president of the clique. The leader was also referred to as "Primero Palabra," or "Shotcaller," or "Corredor," or "Runner." Some cliques had a "Second Word," or "Segundo Palabra," who was the second-in-command of the clique. General members were required to take orders from the First Word or Runner and Second Word.

MS-13 had rules including that its members must attack chavalas whenever they had the opportunity and to never cooperate with law enforcement. Violation of these rules subjected the offending member to discipline. In the case of cooperating with law enforcement, the discipline was death.

---

[1] The terms "MS-13 associate" or "associate of MS-13" are used broadly in this Statement of Facts and include persons known as paros, observations, and chequeos. In addition, the names of the titles for levels or ranks of membership are not all-inclusive, and are constantly changing within MS-13.

MS-13, including its leadership, members and associates, constituted an "enterprise" as defined in Section 1959(b)(2) of Title 18, United States Code, that is, a group of individuals associated in fact that engage in, and the activities of which affect, interstate and foreign commerce. The enterprise constitutes an ongoing organization whose members function as a continuing unit for the common purpose of achieving the objectives of the enterprise. The purposes of the enterprise include the following:

      1.      Preserving and protecting the power, territory and profits of the enterprise through the use of intimidation, violence, including assaults and murder, and threats of violence;

      2.      Promoting and enhancing the enterprise and its members' and associates' activities;

      3.      Keeping victims and potential victims in fear of the enterprise and in fear of its members and associates, through violence and threats of violence;

      4.      Providing financial support to gang members, including those outside of the United States.

In Maryland, Virginia, and elsewhere, MS-13, through its members and associates, engaged in a pattern of racketeering activity as defined in Sections 1959(b) and 1961(1) of Title 18, United States Code, including, but not limited to, acts involving murder, extortion, and distribution of controlled substances in violation of federal laws and the laws of the state of Maryland.

From an unknown date in or about 2018 through April of 2019, the Defendant, **KEVIN ALEXIS RODRIGUEZ-FLORES ("RODRIGUEZ")**, was a member and associate of MS-13. In addition, **RODRIGUEZ** was a member and associate of the Enfermos Criminales Salvatruchas clique of MS-13, but had been associating with members of the LGCS clique, including his co-defendants after relocating to Virginia from New Jersey. During this same time period, prior to the murder of Victim-1 as described below, and through his association with the LGCS clique of MS-13, **RODRIGUEZ** and other members of the LGCS clique discussed committing racketeering acts including killing suspected rival gang members.

From an unknown date in or about 2018 through April of 2019, **RODRIGUEZ** knowingly and intentionally conspired with other members and associates of MS-13 to conduct and participate directly and indirectly in the conduct of the affairs of the enterprise, that is, **RODRIGUEZ** agreed with members and associates of the MS-13 gang to engage in a pattern of racketeering activity, including murder, in order to further the interests of the enterprise. Furthermore, during this same time period, MS-13 gang members in the District of Maryland and elsewhere engaged in said racketeering acts.

Specifically, **RODRIGUEZ**, in furtherance of the racketeering conspiracy, participated in the following acts in the District of Maryland:

### The Murder of Victim-1

On or about Friday, March 8, 2019, **RODRIGUEZ**, along with members of the LGCS clique of MS-13, met at the house of the LGCS clique leader in Hyattsville, Maryland. A purpose of this meeting was for the clique leader to question Victim-1 about Victim-1's recent encounter with the police. Victim-1 was also a member of the LGCS clique. During the interrogation of Victim-1 by the clique leader, MS-13 members, including the clique leader, suspected that Victim-1 was cooperating with law enforcement. MS-13 gang members, including the clique leader threatened and assaulted Victim-1. MS-13 gang members, including the clique leader, also used knives to cut and stab Victim-1. The assault of Victim-1 began on the ground floor of the house, and Victim-1 was eventually taken into the basement of the residence. The clique leader ordered that Victim-1 was to be killed, and MS-13 gang members, including **RODRIGUEZ**, stabbed Victim-1 with knives until Victim-1 was dead. Victim-1 died as a result of **RODRIGUEZ'S** and the other gang member's actions. According to the autopsy report, the cause of death was multiple sharp force injuries, specifically "144 wounds: 68 stab wounds; 76 cutting wounds." In the victim's neck area, the left internal jugular vein was "cut," and his left carotid artery was "transected."

### The Cover-Up

Acting upon orders from the clique leader, MS-13 members loaded the body of Victim-1 into a car, and three MS-13 members drove from Maryland to Virginia in order to dispose of Victim 1's body. **RODRIGUEZ** and other MS-13 members stayed at the home of the LGCS clique leader and attempted to remove and destroy evidence of the murder of Victim-1, including cleaning up blood in the basement and removing blood stained carpet.

After the three MS-13 members returned from disposing of the body of Victim-1, co-conspirators cleaned the car, particularly the trunk area, in an attempt to remove evidence of the murder of Victim-1. **RODRIGUEZ** stayed at the residence of the clique leader until approximately the afternoon hours of March 9, 2019, when he and other MS-13 members traveled by Uber back to Virginia.

The purpose for removing, transporting, and burning of the body of Victim-1, and for cleaning the locations within the home of the LGCS clique leader, and the vehicle used to transport the body of Victim-1, was to destroy and conceal evidence of the murder of Victim-1.

Although **RODRIGUEZ** and the other MS-13 LGCS clique members traveled to and met at the residence of the LGCS clique leader on March 8, 2019, the assault and murder of Victim-1, and the transporting and burning of his body, carried on into March 9, 2019.

### Federal Investigation of MS-13 and the Murder of Victim-1

For numerous years, federal law enforcement agencies including the Federal Bureau of Investigation, and the Department of Homeland Security have investigated criminal activity of MS-13 in the Washington, DC metropolitan area. These investigations have resulted in the federal prosecution of numerous MS-13 members for violent crimes in the District of Maryland and elsewhere. The federal investigation of the murder of Victim-1 began soon after the body of

Victim-1 was discovered on March 9, 2019 in Stafford County, Virginia, and has continued until the present. The federal investigation has included interviewing witnesses, gathering evidence, and conducting forensic examinations of evidence, including evidence that **RODRIGUEZ** and his co-conspirators attempted to destroy and conceal.

SO STIPULATED:

William D. Moomau
Erin B. Pulice
Assistant United States Attorneys

Kevin Alexis Rodriguez-Flores

Alfred Guillaume III, Esq.
Counsel for Defendant

Rev. August 2018