**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX 20-229** |
| | * | |
| **JOSE DOMINGO ORDONEZ-ZOMETA** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\***

<u>**UNITED STATES' CONSOLIDATED RESPONSE IN OPPOSITION TO THE
DEFENDANT'S MOTIONS IN LIMINE**</u>

The United States of America, by and through its undersigned counsel, respectfully submit this Consolidated Response in Opposition to the Defendant's Motions in *Limine*, specifically the Motion in *Limine* re: Clothing (ECF No. 146), Motion in *Limine* re: Gang Expert (ECF No. 147), and Motion in *Limine* re: Blood Spatter Expert Testimony (ECF No. 148.)

**I.  Opposition to Defendant's Motion in *Limine* re: Clothing (ECF No. 146.)**

On October 11, 2022, the Defendant Jose Domingo Ordonez-Zometa ("Ordonez"), through counsel, filed a Motion in *Limine* to Preclude the Introduction of Photographs and Clothing from October 2016 Traffic Stop.  ECF 146.  Ordonez seeks to preclude the admission of evidence and photographs related to a traffic stop in 2016, wherein he was wearing clothing that the Government submits is evidence of his association with MS-13, including a jersey with the number 13 on it, his nickname "Felon," and his MS-13 clique initials "LGCS," as well as jeans with MS-13 written on them.  However, on August 5, 2022, Ordonez filed a pre-trial motion seeking to preclude the exact same evidence from the 2016 traffic stop pursuant to essentially the same authority—Federal Rules of Evidence 403 and 404(b).  *See* ECF 107 (Defendant's Motion for Notice of Government's Intention to Use Rule 404(b) Evidence at Trial and Incorporated Memorandum of Points and Authorities in Support Thereof).  The Government responded to ECF 107 on August 29, 2022.

1

*See* ECF 128 at 33.  It is the Government's understanding that at the motions hearing on September 2, 2022, the Court denied ECF 107, which would render Ordonez's renewed motion to preclude admission of the evidence of the photographs and the clothing (ECF 146) moot.[1]

## II. Opposition to Defendant's Motion in *Limine* re: Gang Expert (ECF No. 147.)

On August 10, 2022, the United States provided notice to Ordonez and the other defendants that Detective Sergeant/Task Force Officer Ricardo A. Guzman ("TFO Guzman") would be called as a gang expert to testify about the organization, leadership, structure, language, rules, practices, history, and operation of MS-13, the alleged "enterprise" in the present case.  The United States also provided the defendants with a copy of TFO Guzman's *curriculum vitae* (attached hereto as Exhibit 1).

Under Federal Rule of Evidence 702, expert testimony, including testimony related to gangs, is permitted if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  However, under Federal Rules of Evidence 401 and 403, the evidence must also be relevant and it may only be excluded "if its probative value is *substantially outweighed* by a danger of . . . unfair prejudice."  Fed. R. Evid. 403 (emphasis added).  In *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 593-595 (1993), the Court established standards for the admissibility of scientific expert testimony when applying Federal Rule of Evidence 702.    In

---

[1] The Court has yet to issue a written Opinion for the pre-trial motions.  However, the Government ordered a copy of the transcript from the September 2, 2022 hearing, but has not yet received the transcript. If the Government is mistaken as to the Court's ruling regarding ECF 107, the Government asks for leave to respond to the instant motion (ECF 146).

*Kumho Tire Co. v. Carmichael*, the Court held that "*Daubert*'s general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge but also to testimony based on 'technical' and 'other specialized' knowledge." 526 U.S. 137, 141 (1999). Further, the test of reliability for expert testimony is "flexible" and "the law grants the district court…broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. at 142 (emphasis in original). "A district court's reliability determination does not exist in a vacuum, as there exist meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). The Court's "gatekeeping" function "is to ensure the reliability and relevancy of expert testimony." *Kumho Tire,* 526 U.S. at 152. When evaluating the relevance and reliability of a law enforcement gang expert, "[t]he *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony [from a gang expert], whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Thomas*, 490 Fed. Appx. 514, 520-521 (4th Cir. 2012) (unpublished) (quoting *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000)); *see also e.g., United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246-47 (9th Cir. 1997) (testimony about training and experience "clearly" established law enforcement agent's qualifications to offer expert testimony about the modus operandi of drug dealers).

"[E]vidence regarding the inner-workings of organized crime has been held to be a proper subject of expert opinion because such matters are 'generally beyond the understanding of the average layman.'" *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (quoting *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996)). Using these standards, the Fourth Circuit has

regularly permitted testimony of gang experts, particularly as it relates to MS-13, the enterprise alleged in the Second Superseding Indictment. *See, e.g.*, *United States v. Palacios*, 677 F.3d 234, 244-243 (4th Cir. 2012) (upholding the expert testimony of an MS-13 law enforcement gang expert); *United States v. Ayala*, 601 F.3d 256, 274 (4th Cir. 2010) (finding no error in the admission of testimony from three expert witnesses, who "based [their] opinion on extensive experience investigating MS-13" in an MS-13 racketeering conspiracy trial); *United States v. Lobo-Lopez*, 468 Fed. Appx. 186, 190 (4th Cir. 2012) (unpublished) (holding that a detective's expert MS-13 testimony was proper wherein the witness had extensive training on the gang, provided training on the gang, had extensive MS-13 investigative experience, and interviewed approximately 50 MS-13 members); *United States v. Garcia*, 474 Fed. Appx. 909, 910-11 (4th Cir. 2012) (unpublished) (finding no error in law enforcement expert's testimony about MS-13, as defendant had not pointed to any testimony that violated the Confrontation Clause or was otherwise improper); *United States v. Thomas*, 490 Fed. Appx. 514, 520-521 (4th Cir. 2012) (unpublished) (holding that the district court's assessment of a law enforcement gang expert's qualifications, and the relevance and reliability of the testimony, was sufficient after extensive voir dire of the witness); *United States v. Zelaya*, 336 Fed. Appx. 355, 356-57 (4th Cir. 2009) (unpublished) (noting that the trial involved over 60 government witnesses, including law enforcement gang experts, who provided evidence about MS-13, the gang's criminal conduct, and defendants' membership).

In *Ayala*, the Court permitted the testimony of three MS-13 law enforcement experts who "based [their] opinions on extensive experience investigating MS-13." *Ayala*, 601 F.3d at 274. Like TFO Guzman, one of the experts in *Ayala* "had conducted surveillance of the gang on many occasions and had participated in the execution of [] search warrants related to the gang" and the

experts "stated that much of [their] knowledge about the gang resulted from interviews with gang members, the families of gang members, and the gang's victims." *Id.* at 274-275.  Here, TFO Guzman has spent at least eight years conducting federal criminal investigations targeting transnational criminal organizations like MS-13.  Exhibit 1 at 1.  These investigations have been short-term and long-term investigations, involving a number of different investigative techniques. *Id.*  His agency has deemed him a subject matter expert on MS-13 and he has testified in both Texas state courts and federal courts as an MS-13 expert, including most recently before this Court in *United States v. Flores-Reyes, et al.* (PX-17-0382).  TFO Guzman's qualifications, along with his prior experience of over eight years investigating MS-13 and transnational criminal organizations, clearly meet the standards set forth in Rule 702.

Ordonez objects to largely the same testimony that was admitted in *Palacios* and *Ayala* (and in other MS-13 RICO Conspiracy cases in this District).  More specifically, he asserts that the testimony of TFO Guzman is "minimally relevant, extremely prejudicial, and creates the risk of confusing the jury."  ECF 147, ¶ 3.  However, TFO Guzman's testimony is relevant and "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702. Specifically, his testimony will assist the jury in understanding the MS-13 enterprise, as well as support the Government's burden of proving that MS-13 is an enterprise.  In racketeering cases, including those involving MS-13, "[g]ang experts assist the trier of fact by . . . explaining the internal workings and language of the gang."  *See Montoya v. United States*, 2013 WL 633586, at *11 (E.D. Va. Feb. 19, 2013); *see also United States v. Ardito*, 782 F.2d 358, 363 (2d Cir. 1986) (expert testimony "describ[ing] such terms as 'captain', 'capo', "regime' and 'crew' . . . aided the jury in its understanding of the recorded conversations").  Here, all three defendants are charged in Count One with Conspiracy to Participate in a Racketeering Enterprise, Count Two with

Conspiracy to Commit Murder in Aid of Racketeering, and in Count Three with Murder in Aid of Racketeering.   To convict the defendants of Count One, the Government must prove that an association-in-fact enterprise, here MS-13, did, or would, exist; and to convict the defendants of Counts Two and Three, the Government must prove the existence of an association-in-fact enterprise.   Therefore, the testimony of TFO Guzman is relevant to proving the existence of the MS-13 enterprise and will assist the trier of fact to make this determination.   *See Palacios*, 677 F.3d at 249 (upholding the admission of government law enforcement expert testimony on MS-13 who "provided the jury with adequate support for its finding that MS-13 members" formed an association-in-fact enterprise).   Therefore, because the Government must prove the existence of the MS-13 enterprise, and the testimony of TFO Guzman is outside the normal purview of a lay witness, his testimony is more probative than prejudicial as it supports material elements of the offenses in Counts One, Two, and Three.

As to his prejudice objection, Ordonez argues that TFO Guzman's testimony "does not help the trier of fact because the testimony is highly prejudice and invades the province of the jury." ECF 147, ¶ 4.   "Of course, in one sense all incriminating evidence is inherently prejudicial. 'The proper question under Rule 404(b), however, is whether such evidence has the potential to cause undue prejudice, and if so, whether the danger of such undue prejudice substantially outweighs its probative value.'"   *United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995) (quoting *United States v. Mark*, 943 F.2d 444, 449 (4th Cir. 1991)).   In this case, Ordonez fails to show how TFO Guzman's testimony is "substantially outweighed" by the danger of unfair prejudice as required under Fed. R. Evid. 403.   *See, e.g., United States v. Chavez*, 894 F.3d 593, 604-05 (4th Cir.) (upholding admission of evidence that defendant participated in reburial of body of victim he was not charged with murdering), *cert. denied*, 139 S.Ct. 278 (2018); *United States v. Kelly*, 510

F.3d 433, 436-38 (4th Cir. 2007) (upholding admission of evidence of defendant's conviction for attempted rape of 12-year old in prosecution for travelling in interstate commerce—22 years later—"to have sex with a 12 year old virgin"), *cert. denied*, 552 U.S. 1329 (2008); *United States v. Williams*, 445 F.3d 724, 729-33 (4th Cir.) (upholding admission of circumstantial evidence of uncharged murder to prove defendant possessed firearm and ammunition), *cert. denied*, 549 U.S. 933 (2006).

Ordonez's primary concerns are that TFO Guzman will testify that MS-13 "allegedly uses threat and violence to accomplish its goals," that "MS-13 requires new recruits to commit homicides in order to move up to higher levels in the" gang, and that "the jury may well conclude that Mr. Ordonez-Zometa committed killing to reach" the rank of Homeboy within MS-13.  ECF 147, ¶¶ 4, 6.  The Fourth Circuit has previously held that an expert is permitted to testify about the rules of MS-13, including entrance into membership.  *See Palacios*, 677 F.3d at 249.  Further, TFO Guzman's testimony that MS-13 members ascend in the gang through violence, and that the gang uses violence to achieve their goals, is not unduly prejudicial in a trial that is, at its heart, about the violence committed by MS-13 members in furtherance of the gang's goals, particularly in a case where it is alleged the gang killed the victim because they believed he was cooperating with law enforcement.  *See Boyd*, 53 F.3d at 637 (holding Rule 404(b) evidence is not barred by Rule 403 when the evidence "did not involve conduct any more sensational or disturbing than the crimes with which he was charged.").  It is not only a necessary part of the story of MS-13 to describe the steps that are taken to ascend in rank within the gang, but the fact that violence is committed in furtherance of ascending or maintaining position in the gang is actually an element of each count of Murder in Aid of Racketeering and Conspiracy to Commit Murder in Aid of Racketeering. *See* 18 U.S.C. § 1959(a)(1) ("Whoever . . . for the purpose of gaining entrance to or maintaining or

increasing position in an enterprise engaged in racketeering activity, murders . . ."). Additionally, TFO Guzman is expected to testify that, while MS-13 cliques generally follow the same rules and customs, some cliques have additional rules or regulations that they follow. Exhibit 2 at 4. In fact, contrary to Ordonez's concerns, the Government expects that the testimony of the cooperators and the expert witness will be that while MS-13 has a number of firm rules (such as attacking rivals and killing cooperators), the specific requirements to move up in the gang can change over time. They may also depend on the clique, and sometimes the area in which they operate or who the leaders were at a particular time. During TFO Guzman's testimony, the Government intends to make clear that some cliques require more significant acts of violence than others to ascend in rank. However, in a trial about murder, conspiracy to commit murder, and a RICO enterprise alleged to have been centered on violence, it is not more prejudicial, let alone substantially more prejudicial, than probative for a gang expert to describe the general hierarchy, structure, means, and methods of the gang. *See United States v. Sandoval*, 6 F.4th 63, 84 (1st Cir. 2021) (noting that even the defendant recognized that "information about MS-13's structure, organization, history, colors, tattoos, and rivals" were "conventional topics" of expert testimony").

Finally, in considering Rule 403 challenges, the Fourth Circuit attributes great weight to the curative power of cautionary jury instructions. *See, e.g., United States v. Sterling*, 860 F.3d 233, 248 (4th Cir. 2017); *United States v. Byers*, 649 F.3d 197, 210-11 (4th Cir.), *cert. denied*, 565 U.S. 969 (2011). Therefore, while the Government does not believe a curative instruction is necessary in this instance, as TFO Guzman's anticipated testimony is proper expert testimony regarding the gang whose probative value is not substantially outweighed by any danger of unfair prejudice, should such a need arise the Government is confident that the Court could craft such an instruction to assuage any concerns about potential prejudice

### III. Opposition to Defendant's Motion in *Limine* re: Blood Spatter Expert Testimony (ECF No. 148.)

The experts' bloodstain pattern analysis testimony is admissible under Federal Rule of Evidence 702, not unduly cumulative, and a *Daubert* hearing is unnecessary.

On March 14, 2019, Prince George's County Police Crime Scene Investigator Cpl. Webb searched the residence at 7000 Varnum Street ("Varnum Residence") for blood, analyzed any patterns discovered, then wrote a report. The conclusion reached by Cpl. Webb was as follows:

> It is this examiners opinion that an assault occurred in the basement of the residence leading to the loss of blood of an individual. The patterns on the wall next to the stairs, the south wall next to the stairs, and the west wall opposite the support wall indicate that the source of the blood was on the ground or close to it. This assault continued throughout the basement. This is indicated by the numerous stains and patterns located around the basement. The diluted perimeter stains indicate that there was an attempt to clean up the blood stains on the floor and the lower parts of the wall. The patterns in the upstairs living room indicate that an assault occurred in this room as well leading to the loss of blood to an individual. The amount of blood in the basement indicates that the injuries to the victim are severe to life threatening.

Exhibit 3 at 13.

On March 14, 2019, Prince George's County Police Crime Scene Investigator Cpl. Hinds searched a Nissan Maxima (the "Nissan") for blood, analyzed any patterns discovered, then wrote a report. The conclusion reached by Cpl. Hinds was as follows:

> The blood patterns documented on this vehicle are consistent with a person who was bleeding and was placed in the trunk of the vehicle. All of the patterns in the trunk are passive drips, flow patterns or transfer patterns, which show that the person was not actively moving in the vehicles trunk as there is no cast off patterns found in this area. There are no patterns at all in the trunk that indicate a bleeding person who was actively moving. Patterns found on the outside of the rear bumper area probably occurred when placing the person in the trunk or removing them from the trunk as they are small passive drip stains. The transfer pattern on the right rear passenger door edge was a pattern that would have been transferred there by contact of another person but not the victim.

Exhibit 4 at 10.

In summary, with respect to the Varnum Residence, Cpl. Webb opines (1) that an assault occurred throughout basement involving the loss a lot of blood (2) that the source of the blood in the basement was on the ground or close to it, (3) that someone attempted to clean it up, (4) someone was assaulted and bleeding upstairs, and (4) that the amount of blood loss in the basement was severe to life threatening.  As to the Nissan, Cpl. Hinds opines (1) that a non-moving body was bleeding in the trunk, (2) the blood on the bumper was probably from putting the body in, or taking the body out, of the trunk, and (3) blood on the right rear passenger door edge was from someone other than the victim in the trunk.

Ordonez's characterization of these as "sweeping conclusions" is not born out when viewed in the context of the facts of this case.  None of the conclusions reached by the experts, while important evidence for the jury, are anticipated to be controversial or actually appear to be in dispute, thus far.  As far as the government is aware, there will be no evidence, argument, or testimony that the death of the victim was by mere accident—or occurred elsewhere.  After determining whether the government has met its burden as to each element, the ultimate task for the jury will likely be to determine which, if any, of the defendants are guilty of each count, not whether he died somewhere other than in the basement, or by any means other than a stabbing.

The oft-cited "*Daubert* factors" are often helpful in appropriate cases, but are ultimately optional.  They are:

1. Whether a theory or technique can be (and has been) tested

2. Whether the theory or technique has been subjected to peer review and publication

3. The known or potential rate of error of a particular scientific technique

4. The existence and maintenance of standards controlling the technique's operation

5. A scientific technique's degree of acceptance within a relevant scientific community

*Daubert*, *id.* at 595.  Courts have found bloodstain pattern analysis evidence admissible.  *See e.g., Crawford v. County of Dauphin*, 2006 U.S. Dist. LEXIS 15818 (M.D. Pa. 2006); *Correll v. Sec'y, Dep't Of Corr.*, 932 F.Supp.2d 1257 (M.D. Fl. 2013) ("[S]he was—in a believable and effective way through blood spatter analysis—able to demonstrate to the jury and to the court exactly how [defendant] went about killing these four people."); *United States v. Phillips*, 948 F.2d 241, 247-49 (6th Cir. 1991)  Bloodstain pattern evidence has sometimes even been found to be admissible when the analysis is performed on *mere pictures* of bloodstains, rather than observation of the blood itself.  *See Bratt v. Genovese*, 2017 U.S. Dist. LEXIS 204003 (M.D. Fl. 2017); *Duyst v. Rapelje*, 483 Fed. Appx. 36, 48 (6th Cir. 2012) (noting that blood spatter expert opinion and testimony was based on photographs rather than in person examination and quoting expert to say "it's not unusual for me to only receive photographs, write a report based on it...."); *Harrington v. Richter*, 562 U.S. 86, 96, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (noting appellant's reliance on statement from an expert in bloodstain analysis who relied on photographs to form an opinion regarding source of blood at a crime scene.)

In this case, Cpl. Webb and Cpl. Hines did not draw any conclusions about the number of assailant(s), the identities of the assailant(s), the various locations or positions of the assailant(s), or any other conclusion that are beyond the scope of the particular bloodstain analysis in this case. They did not engage in the kinds of unwarranted or unsupported extrapolations that were potentially problematic in the 2009 report by the National Academy of Sciences cited by Ordonez. *See* Exhibit 5 ("Scientific studies support some aspects of bloodstain pattern analysis.  One can tell, for example, if the blood spattered quickly or slowly, but some experts extrapolate far beyond what can be supported.")

Even though the conclusions aren't "sweeping," Ordonez is also incorrect that the

testimony would be "minimally relevant and cumulative."  The government anticipates that Ordonez will attempt to impeach the witnesses' testimony regarding the events of the night.  The bloodstain pattern analysis evidence will assist the jury in corroborating the testimony of the witnesses by providing insight untethered to a witness who was present that night—it is not cumulative, it is confirmatory.  In a case in which the victim is unable to speak for himself, evidence corroborating the testimony of the witnesses is crucial and should not be excluded.

Contrary to Ordonez's assertion, the fact that the experts indicated that their opinions could change if presented with additional facts, redounds to their favor and is precisely what any expert should do if presented with additional facts.  The testimony of any expert witness who said that their opinion could never change if presented with additional evidence would be highly unusual and likely unreliable.

Many of Ordonez's concerns go to the weight of the evidence, not its admissibility. Ordonez will have ample opportunity to cross the experts during trial, or call his own witnesses, if he should so choose.  The bloodstain pattern analysis testimony is admissible under Federal Rule of Evidence 702, not unduly cumulative, and a *Daubert* hearing is unnecessary.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny the

Defendant's Motions in *Limine*, specifically the Motion in *Limine* re: Clothing (ECF No. 146),

Motion in *Limine* re: Gang Expert (ECF No. 147), and Motion in *Limine* re: Blood Spatter Expert

Testimony (ECF No. 148.).

Respectfully submitted,

Erek L. Barron
United States Attorney

David L. Jaffe
Chief, Organized Crime and Gang Section

Digitally signed by GARY MORGAN
Date: 2022.10.18 23:55:55 -04'00'

By: _____

G. Michael Morgan, Jr.
Assistant United States Attorney
Jared C. Engelking
Special Assistant United States Attorney
6500 Cherrywood Lane, Suite 200
Greenbelt, MD  20770
Tel.: (301) 344-4433

_____/s/_____

Matthew K. Hoff
Trial Attorney
Organized Crime and Gang Section
U.S. Department of Justice
1301 New York Avenue, NW
Suite 700
Washington, D.C. 20005
Tel.: (202) 598-8093

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was filed with the Clerk of the Court

using the CM/ECF system, which will send notice to all counsel of record, on October 18, 2022.


_____/s_____
G. Michael Morgan, Jr.
Assistant United States Attorney